# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Ruth M. Maynard,

                                Plaintiff,

                                                Civ. No. 05-1089 (RHK/AJB)
                                                **MEMORANDUM OPINION**
                                                **AND ORDER**
v.


Motors Management Corporation

                                Defendant.

James H. Kaster and Jessica J. Clay, Nichols Kaster & Anderson, PLLP, Minneapolis, Minnesota, for Plaintiff.

George R. Wood and Stephanie D. Sarantopoulos, Littler Mendelson, P.C., Minneapolis, Minnesota, for Defendant.


## Introduction

In this employment discrimination case, Plaintiff Ruth Maynard alleges that her former employer, Defendant Motors Management Corporation ("MMC"), unlawfully terminated her employment based on her gender and in retaliation for her engaging in two protected activities. Maynard further alleges that MMC failed to rehire her in retaliation for engaging in a protected activity. In its Motion for Summary Judgment, MMC maintains that Maynard's employment was terminated because she performed poorly as a General Manager and that she was not rehired due to the objections of other employees. For the reasons set forth below, the Court will grant MMC's Motion in part and deny it in part.

## Background

Maynard has been working in automotive sales since 1979.  (Maynard Dep. Tr. at 8.)

In 1987, she began working for the Luther Automotive Group ("LAG") as the Finance and

Insurance ("F&I") Manager for Downtown Pontiac Jaguar.  (Id. at 9-11.)  In 1990, Maynard

moved to Hopkins Honda, another LAG dealership, where she began as a salesperson.  (Id.

at 16.)  In 1997, she was promoted to Fleet Sales Manager, a position she held until roughly

eight months later, when she was promoted to New Car Manager.  (Id. at 20-21.)  In 2000,

Maynard was promoted to General Sales Manager, a position she held until 2003.  (Id.)

In January 2003, David Luther, President of MMC[1], offered Maynard the General

Manager ("GM") position for LAG dealership Burnsville Volkswagen ("BVW").  (Id. at 118-

20.)  Despite some initial reservations, Maynard accepted the position and, on January 21,

2003, began as GM of BVW.  (Id. at 108, 118, 122.)  In that position, Maynard received a

yearly salary of $211,200 and her duties were to include overseeing the New Car, Used Car,

F&I, Service, and Parts Departments.  (Id. at 30, 108.)  In January 2003, the four highest

level executives at MMC were Luther, Mike Gallagher[2], Tim O'Dougherty[3], and Mark

Morcomb.

---

[1]MMC employs the General Managers for LAG dealerships.  (Gallagher Aff. ¶ 2.)
MMC also provides management, financial, human resources, and operation services to
dealerships that are part of LAG.  (Id.)

[2]Maynard reported to Gallagher and he was largely involved in the decisions to hire
(and eventually fire) Maynard (Luther Dep. Tr. at 20, 102-03; Maynard Dep. Tr. at 28).

[3] O'Dougherty's "broad" responsibilities included employee-related issues (Luther
Dep. Tr. at 10-11).

**A.      Maynard's Working Conditions at BVW**

Maynard focuses her allegations on problems she experienced while she was GM at

BVW relating to Joe Medvec and Steve Hendricks.[4]

**1.      Problems with Joe Medvec**

On March 10, 2003, Maynard received an anonymous letter stating that Joe Medvec,

BVW Used Car Manager, had made an offensive comment about Maynard's husband, who is

African-American, and her children, who are bi-racial.  (Clay Aff. Ex. 14.)  By March 12,

Maynard had investigated the incident and decided to terminate Medvec.  (Clay Aff. Ex. 15.)

Medvec denied making the statement, but did not contest his termination.  (Medvec Dep. Tr.

at 10, 26-27.)

Maynard believes Luther was unhappy with her decision to terminate Medvec.

Maynard discussed the incident with O'Dougherty, who advised her to let him break the

news of Medvec's termination to Luther because Luther liked Medvec and might "have a

hissy fit."  (Maynard Dep. Tr. at 195-96.)  In October 2003, Maynard recalls a meeting with

Luther in which Luther became angry and emphatically advised her to rehire Medvec.  (Id. at

---

[4] Maynard also alleges, more generally, that certain offensive acts took place
immediately upon her arrival at BVW.  At her first meeting as GM, when she was
introduced to the other GMs employed by MMC, Maynard alleges that Bob Terp, another
GM, grabbed her buttocks.  (Maynard Dep. Tr. at 52, 290.)  She also had to tell employees
to take down inappropriate photos, screen savers, calenders, and cartoons.  (Maynard Decl.
¶¶ 2-4.)  Some employees also wore buttons with the phrase "kiss me."  (Id.)  In addition,
Maynard alleges a number of offensive acts and statements by Terp during the time they
both worked at Downtown Pontiac Jaguar.  (See Maynard Dep. Tr. at 16-17.)  According to
Maynard, however, any acts she was subjected to before her tenure at BVW, do not "form
the basis for [her] current complaints."  (Mem. in Opp'n at 4 n.5.)

35-36.)  Maynard also testified that Gallagher repeatedly asked her to rehire Medvec, the

last such request coming around November 2004.  (Id. at 270, 276.)  Luther does not recall

his discussion with Maynard concerning Medvec; he testified that he supported the decision

to terminate Medvec "100%" and never suggested that Maynard rehire Medvec.  (Luther

Dep. Tr. at 69-72.)

### 2.        Problems with Steve Hendricks

Steve Hendricks was GM of Westside Volkswagen.  (See MMC Interrog. ¶ 12.)

Within two or three weeks of her arrival at BVW, Maynard set up a meeting with Hendricks.

(Maynard Dep. Tr. at 157.)  The meeting was suggested by O'Dougherty, who told Maynard

that because Hendricks operated a similar dealership, she should "try to get [Hendricks] on

[her] side."  (Id.)  The meeting did not accomplish that goal.  As Maynard recalls, shortly

after the meeting began, Hendricks became excited and angry and told her that he did not

feel she should have gotten the position.  (Id. at 158.)  He stated that he recommended other

people to Luther and that he did not think someone "coming from Honda" could

successfully handle the position.  (Id. at 158-59.)  Maynard believes her gender was a factor

in Hendricks's doubts about her abilities.  (Id. at 161.)

Maynard's conflicts with Hendricks continued throughout her tenure at BVW.  On

September 14, 2004, Maynard sent a letter to MMC stating that she felt Hendricks was

harassing her and interfering with her dealership.  (Clay Aff. Ex. 16.)  In that letter, she

complained that Hendricks was: (1) having discussions with her employees in which he

indicated that if they were not being paid enough or getting appropriate time off he would

handle it; (2) questioning her work ethic, schedule, and credentials to her employees, peers,

and superiors; (3) encouraging MMC employees to coerce her into rehiring fired managers

(including Medvec); (4) verbally "lambasting" her for firing another employee, then

"commiserating" with the fired employee; (5) and interfering with her ability to buy used

cars at auctions.  (Id.)  Maynard testified that her first draft of the letter referenced

Hendricks's treatment of women, but that she deleted any reference to gender before

sending the letter to MMC.[5]  (Maynard Dep. Tr. at 348-49.)

On October 15, 2004, Maynard met with Gallagher and Kathleen Potter, Director of

Human Resources at MMC, to discuss her letter about Hendricks.  (Id. at 357-58; Clay Aff.

Ex. 17; Potter Dep. Tr. at 9-11.)  Potter came away from the meeting with the understanding

that Maynard did not want Potter to "talk to any of these people about any of this."  (Potter

Dep. Tr. at 41-42.)  On October 25, 2004, Gallagher met with Hendricks and told him that

some of his actions with respect to BVW could be considered "meddling."  (Clay Aff. Ex.

18.)  Gallagher advised Hendricks to avoid contact with BVW employees and "keep his

opinion of [BVW's] situation to himself."  (Id.)  He did not tell Hendricks that Maynard had

made a complaint.  (Id.)

On November 12, 2004, Maynard again met with Gallagher and Potter.  (Clay Aff. Ex.

19.)  At this meeting Maynard clarified that she did not want them to discuss the Hendricks

---

[5] Maynard alleges that she deleted the reference to gender on the advice of Jim
Leslie, a consultant from the Leslie Learning Group, who did consulting work for MMC,
and specifically with BVW during 2004.  (Maynard Dep. Tr. at 348-49; Leslie Dep. Tr. at
10-12.)

situation with her employees, but she did not oppose them discussing it with Hendricks.

(Id.)  She also informed them that some of her employees heard about Hendricks ridiculing

one of her advertisements and that Hendricks asked one of her employees "how long is she

going [to] be there?  When are they going to get rid of her?"  (Id.)  Maynard gave Gallagher

and Potter the phone number of one of her employees who could confirm her new

allegations.  (Id.)

On November 16, 2004, Maynard met with Luther and Gallagher.  (Clay Aff. Ex. 22.)

According to Gallagher's notes from the meeting, Luther and Gallagher told Maynard that

they would deal with the Hendricks "distraction" after completing an investigation.  (Id.)

Gallagher's notes also indicate that Maynard responded that she was disappointed with

herself for letting him get "under [her] skin"; that the previous week she had been acting like

a "little girl" and that she was "bigger than that"; and that she attributed much of her past

week's performance to her father having health problems.  (Id.)

## B.    The Financial Performance of BVW

On January 21, 2003, Maynard assumed the GM position at BVW.  (Maynard Dep. Tr.

at 108.)  From 1998 to 2002, prior to Maynard's January 2003 start date, BVW had a profit

of at least $1.7 million each year.  (Gallagher Aff. ¶ 7.)  In 2003, BVW lost $158,425,

which was a swing of $2.025 million from the $1.866 million profit BVW earned in 2002.

(Maynard Dep. Tr. at 314; Gallagher Supplemental Aff. "Gallagher Aff. II" ¶ 4 .)  This was

the largest decline in profit of any LAG dealership in 2003.  (Gallagher Aff. ¶ 7.)  In 2004,

BVW had an overall profit of $20,699.  (Sarantopoulos Aff. Ex. C-3; Gallagher Aff. II Ex.

6

B.)  The 2004 profit was achieved largely because MMC reduced BVW's rent by $250,000 for that year.  (See Sarantopoulos Aff. Ex. C-3; Gallagher Aff. II ¶ 4; Maynard Dep. Tr. at 155.)

Many of the financial problems Maynard encountered at BVW arose from the Used Car Department.  After terminating Medvec in March 2003, Maynard hired John Steinmetz as Used Car Manager.  (Maynard Dep. Tr. at 76.)  By the end of 2003, the Used Car Department had lost $813,452, which was the largest used car loss of any LAG dealership.  (Gallagher Aff. II ¶ 13.)  As a result, Maynard fired Steinmetz and hired Doreen Fischer as Used Car Manager.  (Sarantopoulos Aff. Ex. C-3; Maynard Dep. Tr. at 76-77.)

In early 2004, Maynard began receiving assistance from Gallagher, Leslie, and Morcomb, in an effort to improve BVW's performance.  (Sarantopoulos Aff. Ex. C-1; Leslie Dep. Tr. at 10-12.)  Maynard agreed to a goal of a 9% "net to gross" ratio for 2004.  (Gallagher Aff. ¶ 8; Sarantopoulos Aff. Ex. C-2.)  This goal was less than half of the "net to gross" earned by Westside Volkswagen, LAG's other Volkswagen dealership, during 2004.  (Gallagher Aff. ¶ 8.)

By July 2004, the Used Car Department had shown improvement[6] and, with the help of some other dealership-wide improvements,[7] BVW had made a profit of $643,963.

---

[6] From January to June of 2004 the number of used cars sold increased from 97 to 141 and the gross profit per vehicle went from $870 to $1,404.   (Sarantopoulos Aff. Ex. C-3.)

[7] Overall expenses decreased $70,000 per month.  (Sarantopoulos Aff. Ex. C-1.)  Maynard credited Gallagher and Morcomb with helping achieve this result.  (Id.)

7

(Sarantopoulos Aff. Ex. C-3.)

In mid-June 2004, Maynard terminated Fischer as Used Car Manager, citing a "large trust issue." (Id.; Sarantopoulos Aff. Ex. C-2.) Maynard did not fill the position immediately, instead choosing to assume the responsibilities herself. (Sarantopoulos Aff. Ex. C-3.) In late summer 2004, Jason Bestler, a BVW employee, purchased a large number of cars at auctions. (Sarantopoulos Aff. Exs. C-2, C-3.) This job was generally done by the Used Car Manager. (Maynard Dep. Tr. at 223-24.) A combination of Bestler purchasing more cars than appropriate for the time of year and Maynard's strategy to pursue the greatest gross profit per car, rather than trying to unload excess inventory, contributed to a used car loss of $808,498 for 2004. (Sarantopoulos Aff. Exs. C-2, C-3; Gallagher Aff. II ¶ 13.) This was the worst used car loss of any LAG dealership, the second straight year BVW held that ranking. (Gallagher Aff. II ¶ 13.)

In August 2004, BVW also experienced difficulties in the Service Department. (Sarantopoulos Aff. Exs. C-2, C-3.) A number of the department's technicians quit, some due to problems with the Service Department Manager, Rick Westlund. (Id.) Maynard eventually terminated Westlund, but Gallagher believed she made the decision too slowly, resulting in the loss of about one third of the staff. (Id.)

On November 16, 2004, during Maynard's meeting with Gallagher and Luther that addressed the Hendricks situation, the three also addressed the financial conditions at BVW. (Clay Aff. Ex. 22.) Specifically, Maynard asked for their patience, believing she had a team in place and was ready to "turn the corner." (Id.) Luther told Maynard that it was time to

8

"expect the store to reach profitability." (Id.)  After the meeting, Maynard sent an e-mail to

Luther reflecting on the meeting by saying it was "positive" for her and a "source of

strength." (Sarantopoulos Aff. Ex. C-1.)  She added that she had taken to heart Luther's

message from another GM meeting: "no more talk; just action!" (Id.)

2004 ended with a December inventory statement which Maynard described in a

January 6, 2005 e-mail to Gallagher as "bloody," (Sarantopoulos Aff. Ex. C-2) and with

BVW's profits well below the 9% "net to gross" goal set at the beginning of the year

(Sarantopoulos Aff. Ex. C-3).

In January 2005, Gallagher informed Luther that he believed Maynard should be

terminated as GM of BVW.  (Gallagher Dep. Tr. at 10-11; Luther Dep. Tr. at 102-04.)

Luther agreed with Gallagher's assessment and the two decided to go forward with her

termination.  (Id.)  The decision was based on what Gallagher considered poor financial

performance, poor hiring and firing decisions, and her having "lost control" of the Used Car

and Service Departments.  (Gallagher Dep. Tr. at 10.)  As Luther recalls, he and Gallagher

believed that "the needle wasn't moving in the right direction" and was, in fact, "moving in

the wrong direction again."  (Luther Dep Tr. at 103.)  On January 26, 2005, MMC

terminated Maynard.  (Maynard Dep. Tr. at 352.)

## C.  Maynard's Attempt to Return to Hopkins Honda

Shortly after Maynard was terminated from BVW, Luther asked Kyle Allison, GM of

Hopkins Honda, if he would consider hiring Maynard back to her previous position of

General Sales Manager.  (Allison Dep. Tr. at 31.)  This position had not been filled since

Maynard left in early 2003 because Allison "didn't believe it was necessary."  (Id. at 28.)

Luther only recalls asking Allison if he had any openings at Hopkins Honda, not specifically

asking Allison to rehire Maynard.[8]  (Luther Dep. Tr. at 109.)  In any event, it is clear that

Allison believes that Luther initiated the discussion which led to the rehiring of Maynard.

(Allison Dep. Tr. at 31 ("[Luther] asked me to consider having [Maynard] come back to

Hopkins Honda."), 35 ("the main subject [of my meeting with Luther] was the one of

bringing [Maynard] back."), 38.)

On January 27, 2005, Maynard and Allison met to discuss her joining Hopkins Honda

as General Sales Manager, as well as her potential salary, hours and duties.  (Maynard Dep.

Tr. at 143-44; Clay Aff. Ex. 23; Allison Dep. Tr. at 25-27.)  Maynard recalls discussing a

salary of $190,000, demo cars that she would drive, a vehicle for her husband, and vacation

time.  (Clay Aff. Ex. 23.)  Maynard also remembers discussing a potential problem with

Mike Murphy, the New Car Manager at Hopkins Honda.  (Maynard Dep. Tr. at 144.)  Allison

believed Murphy would have a problem with Maynard coming back, and might quit if she did,

but that Murphy's departure would not be a problem.  (Id.)  Allison and Maynard discussed

how it would affect her hours at Hopkins Honda if Murphy left.  (Id.)  Maynard recalls the

two shaking hands at the end of the meeting, and was under the impression that she had been

_____

[8] Luther and Allison also differ regarding the extent of their communication.
Allison recalls Luther asking him about rehiring Maynard on the phone as well as in a face-
to-face meeting.  (Allison Dep. Tr. at 33.)  Luther, however, "believes" he had only one
discussion with Allison on this matter and it took place over the phone.  (Luther Dep Tr. at
109.)

offered the job at Hopkins Honda.  (Clay Aff. Ex. 23.)  Later in the day, Maynard called

Luther to tell him about her new employment opportunity and he replied that it "put a smile

on his face."[9]  (Maynard Dep. Tr. at 143.)

> The following day, January 28, 2005, Maynard sent the following e-mail to Luther:
>
> I was glad to be able to reach an acceptable agreement with [Allison] yesterday, in
> regards to being at Hopkins Honda.  I am very happy to be a continuing and
> contributing member of the Luther group.
>
> Having said that, I know that after 25 years of working in the auto industry, my
> change of positions will be viewed by the dealership community as a
> demotion; and my reputation will suffer.  I am also going to have a lower
> income in my new job.  I would like a fair and equitable resolution to put
> closure on this position change.  I am asking for 5 months salary to be paid as
> a bonus for these issues.

(Clay Aff. Ex. 24.)

> Later that day, Luther responded to Maynard's e-mail with a phone call.  (Id. at 143-

44; Luther Dep. Tr. at 121.)  As Maynard recalls, Luther was angry and an argument ensued.

(Maynard Dep. Tr. at 144.)  Maynard then stated that she "was so tired of how women were

treated at the Luther group" followed by Luther saying "yeah sure" and the phone call

ending.[10]  (Id.; Clay Aff. Ex. 23.)  Luther recalls being confused and "shocked" by her request

for severance pay, but does not believe he was angry.  (Luther Dep. Tr. at 121.)  Further,

---

[9] Luther does not recall the specifics of this conversation, but he does not dispute
Maynard's recollection and does remember saying that the news put a smile on his face.
(Luther Dep Tr. at 119-20.)

[10] Maynard testified:  ". . .[Luther] called me in a very angry phone call and we
exchanged words and he was very angry, and I told him I was so tired of how women were
treated in the Luther group and he got angry and we got off the phone."  (Maynard Dep Tr. at
143-44.)

Luther does not believe that Maynard made the comment to him about the treatment of

women at MMC, but Luther "can't say [he] can deny it."  (Id. at 121-22.)

On January 31, 2005, Maynard and Allison met a second time.  (See Allison Dep. Tr.

at 37; Clay Aff. Ex. 23.)  At that meeting Allison informed her that he would not be hiring

her to work at Hopkins Honda.  (Allison Dep. Tr. at 37, 39.)  Allison testified that he did not

think rehiring Maynard was "in the best interests of [Hopkins Honda]" because the four

senior managers who would be working for Maynard "were against the idea."  (Id. at 31.)

Maynard then asked if her phone call with Luther had anything to do with her not being hired.

(Maynard Dep. Tr. at 144-45.)  Allison said "no," to which Maynard asked "then how do you

know what phone call?"  (Id. at 145.)  Allison responded that he did not know what phone call

she was referring to.  (Id.)  Soon after this exchange the meeting ended.  (Id.)

There is no direct evidence that Allison and Luther communicated during the days

between Maynard's call with Luther and her being told she would not have a job at Hopkins

Honda.  Luther is "fairly certain" he did not have discussions with Allison about any phone

call with Maynard, but he is not "100 percent" certain.  (Luther Dep. Tr. at 115.)  Gallagher,

who has an office next to Luther, talked to Allison on the phone on January 30, 2005, the

day before Allison's second meeting with Maynard.  (Clay Aff. Exs. 25, 26; Gallagher Dep.

Tr. at 184.)  Gallagher does not recall this phone call.  (Gallagher Dep. Tr. at 191.)

Gallagher also does not recall, but does not deny, discussing Maynard's e-mail or phone call

with Luther before the decision was made to not rehire Maynard.  (Gallagher Dep. Tr. at

182-85.)

**D.      The Instant Litigation**

On June 3, 2005, Maynard commenced this suit against MMC alleging gender

discrimination under Title VII, 42 U.S.C. § 2000e-2, and the Minnesota Human Rights Act

("MHRA"), Minn. Stat. § 363A.08.  (Compl. ¶¶ 31-41.)  Maynard also alleges three counts

of reprisal discrimination (retaliation) under Title VII, 42 U.S.C. § 2000e-3, and under the

MHRA, Minn. Stat. § 363A.15.[11]  (Compl. ¶¶ 58-70.)  MMC now moves for Summary

Judgment.

<strong>Standard of Review</strong>

Summary Judgment is appropriate where there is no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c)  For

purposes of summary judgment, a fact is "material" if its resolution will determine the

outcome of the case, and an issue is "genuine" if the evidence is such that a reasonable jury

could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby Inc., 477

U.S. 242, 248 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586-87 (1986).  Upon a motion for summary judgment, the moving party carries the burden

of showing there is no genuine issue of material fact, and all evidence and reasonable

inferences must be viewed in a light most favorable to the non-moving party.  Celotex Corp.

v. Catrett, 477 U.S. 317, 322 (1986).

---

[11] Maynard also brought claims under the federal and State equal pay acts, and for
race discrimination under Title VII.  She has voluntarily withdrawn these claims.  (Mem. in
Opp'n at 2 n.1.)

**Analysis**

Maynard argues that she was discharged because of her gender and retaliated against in violation of both Title VII and the MHRA.  The Court will address each of her claims in turn.

**A.     Gender Discrimination**

A gender discrimination claim will survive summary judgment if the plaintiff can produce direct evidence of discrimination.   Russell v. City of Kansas City, Mo., 414 F.3d 863, 866 (8th Cir. 2005).  In the absence of direct evidence, the plaintiff's claim can survive a motion by creating an inference of unlawful discrimination through the McDonnell Douglas three-step burden-shifting analysis.  Turner v. Gonzales, 421 F.3d 688, 694 (8th Cir. 2005).   Maynard concedes that there is not sufficient direct evidence to meet her burden (Mem. in Opp'n at 35); accordingly, the Court will analyze her claim under McDonnell Douglas.

Under the McDonnell Douglas test, Maynard must present a prima facie case of discrimination by showing that she (1) belonged to a protected class; (2) was meeting MMC's legitimate expectations;[12] (3) suffered an adverse employment action; and (4) was

_____

[12] The parties dispute the appropriate standard for this element of Maynard's prima facie case.  Maynard argues that she must show only that she was qualified to perform her job, whereas MMC argues that Maynard must show that she was meeting its legitimate expectations.  (Mem. in Opp'n at 36-37; Mem. in Supp. at 16-17.)  Any practical difference between these standards will not affect the outcome of this motion.  See Riser v. Target Corp., — F.3d —, 2006 WL 2370475, at *2 (8th Cir. Aug. 17, 2006) ("[E]ven assuming that there is a distinction with a difference between the two articulations, and 'the qualified for the job'-articulation at the second step is indeed a less onerous standard, as [the

treated differently than similarly situated males or can provide some other evidence that

gives rise to an inference of unlawful discrimination.  Box v. Principi, 442 F.3d 692, 696

(8th Cir. 2006); Turner, 421 F.3d at 694.  If Maynard presents a prima facie case, the burden

shifts to MMC to proffer a legitimate non-discriminatory reason for her termination.  Id.

MMC's burden at this stage is a burden of production, not a burden of proof.  Kratzer v.

Rockwell Collins, Inc., 398 F.3d 1040, 1046 (8th Cir. 2005).  The burden then shifts back to

Maynard to show that MMC's reason was pretextual.  Id.

Maynard claims that her termination was discriminatory because she was qualified

for her job and was treated differently than similarly situated male GMs.  For the purposes

of this Motion, the Court assumes that Maynard met her prima facie burden, and will

proceed to MMC's proffered legitimate, non-discriminatory reason for Maynard's

termination.

### 1.     Legitimate Non-Discriminatory Reason

To meet its burden of showing a legitimate non-discriminatory reason for Maynard's

termination, MMC cites BVW's significant decrease in profitability during her time as GM;

Maynard's inability to restore BVW to its previous level of profitability; and her poor

personnel decisions.  (Mem. in Supp. at 17.)   MMC has produced evidence that BVW was

consistently profitable for the five year period preceding Maynard's arrival, then had a

significant drop in profitability to the point that it incurred a loss in 2003, only returning to

---

plaintiff] contends, we need not devote extensive analysis to the subject here.  Rather, we
must see the forest through the trees.").

profitability in 2004 because MMC reduced BVW's rent by more money than the dealership

earned in that year.  (See Gallagher Aff. ¶ 7; Gallagher Aff. II ¶ 4; Maynard Dep. Tr. 155,

314.)  MMC also points to BVW's struggles in the Used Car Department during Maynard's

tenure.  The department underwent considerable personnel turn-over and had the largest loss

of any Used Car Department in an LAG dealership for two consecutive years.  (Maynard

Dep. Tr. at 76-77; Gallagher Aff. II ¶ 13.)  Accordingly, the Court determines that MMC has

produced a legitimate non-discriminatory reason for its decision to terminate Maynard.

### 2.      Pretext

Because MMC has come forward with a legitimate business reason for Maynard's

termination, she must raise a genuine issue of material fact as to whether MMC's reason is

pretextual, such that the real reason for her termination was unlawful gender discrimination.

See Breeding v. Arthur J. Gallagher and Co., 164 F.3d 1151, 1157 (8th Cir. 1999).  Maynard

can raise an issue of fact concerning pretext by showing that MMC's legitimate reasons for

her termination are not believable, or by showing that her gender was the actual reason for

her termination.  Peterson v. Scott County, 406 F.3d 515, 521-22 (8th Cir. 2005); Reeves v.

Sanderson Plumbing Prods. Inc., 530 U.S. 133, 147 (2000).  To make this showing, Maynard

relies on (a) evidence of male GMs at less profitable dealerships who were not fired; (b) her

own impressions that male GMs were given more control over their dealerships; (c)

allegations of misconduct by male GMs who were not terminated; and (d) various incidents

that indicate a lack of respect for women by other GMs and Luther.  (Mem. in Opp'n at 38-

39.)  The Court will address each argument in turn.

16

### a.      Other GMs being retained despite poor financial performance

Maynard argues that there are similarly situated male GMs who performed as poorly as she did and were not terminated.  She contends this shows that MMC's proffered reason for her termination—BVW's poor financial performance—is pretextual.  (Mem. in Opp'n at 31-32.)  At the pretext stage of the McDonnell Douglas burden-shifting framework for a disparate treatment claim, the test for determining whether employees are similarly situated is a "rigorous one."  Rodgers v. US Bank, N.A., 417 F.3d 845, 853 (8th Cir. 2005).  Maynard must point to other employees who "have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000) (citing Lynn v. Deaconess Med. Ctr.-W. Campus, 160 F.3d 487, 488 (8th Cir. 1998)) (emphasis added); Rodgers, 417 F.3d at 853.

Maynard identifies Frank Wrzos, GM of North County Ford, as a similarly situated GM in terms of market, gross profit, and pervious performance of the dealership, who was not terminated at the time that she was.  (Pl. Resp. to Reply at 3.)  North Country Ford did suffer a loss in 2004.  However, Maynard does not assert that North Country Ford had also suffered a loss in 2003, as BVW had.  Nor does Maynard address the fact that "historic performance of the dealership" is a relevant factor in MMC's determination of dealership performance.  (Gallagher Aff. II ¶ 4.)  And, while North Country Ford apparently earned a net profit in 2002, Maynard does not argue that it was historically "one of LAG's most profitable stores," as BVW was prior to her tenure as GM.  (Id.)  In addition, MMC

17

maintains that domestic car dealerships tend to be less profitable than imported car

dealerships, and their performance is evaluated differently by MMC.[13]  (Id. ¶ 3.)  Because

these are material "mitigating or distinguishing circumstances" between Maynard and BVW,

and Wrzos and North Country Ford, the Court determines that they are not similarly situated

for purposes of its pretext analysis.  Clark, 218 F.3d at 918; Rodgers, 417 F.3d at 853

(plaintiff "must show that she and the employees outside of her protected group were

similarly situated in all relevant respects" (citation omitted)).

Maynard also points out that nine LAG dealerships had a lower net income than BVW

in 2004.  (Mem. in Opp'n at 31.)   Further, several dealerships had lower numbers in terms

of new car income, total used car sales, service department sales, and parts sales.  (Id. at 31-

32.)  Again, Maynard has not met her burden of showing that the other, allegedly more

poorly performing dealerships, were similarly situated to hers and treated differently.  Her

failure to meet this burden is best demonstrated by analyzing the 2004 net income rankings

she offered as evidence of pretext.  While Maynard does not address any potentially

mitigating factors (or lack thereof) in comparing the other dealerships with BVW, MMC has

presented evidence regarding the circumstances surrounding each dealership with lower net

income than BVW.  (Gallagher Aff. II ¶¶ 9, 10.)  Of the nine relevant dealerships, the GMs

at five either resigned when told to improve performance or were terminated.  (Id. ¶ 10.)

The other dealerships either experienced a mitigating circumstance, such as road

---

[13]It is also worth noting that Wrzos "resigned in 2006 after being told to increase
profitability."  (Gallagher Aff. II ¶ 10.)

construction that temporarily restricted access, or have had another action taken to eliminate problems, such as merging with another dealership or moving locations. (Id.) Accordingly, the Court determines that Maynard has failed to raise a genuine issue of material fact with respect to whether she was treated differently than other similarly situated GMs or dealerships.

### b.    Maynard's assertion that male GMs had more control of their dealerships

Maynard asserts that every decision she made as GM was questioned, but male GMs were given "free reign to do as they pleased." (Mem. in Opp'n at 38.) She argues that this disparate treatment shows that gender discrimination is the real reason for her termination, and MMC's proffered reasons are pretextual. (Id.) As the Eighth Circuit noted in Rose-Maston v. NME Hosps., Inc., "unsubstantiated and conclusory allegations are insufficient to support an inference of pretext." 133 F.3d 1104, 1109 (8th Cir. 1998). Here, Maynard provides no evidence of different treatment between herself and male GMs other than her own conclusions that she was micro-managed and male GMs were given free reign. Her conclusion is supported only by her recollection of discussions with other employees that indicate she was on a shorter leash than other GMs. (See Mem. in Opp'n at 38; Maynard Dep. Tr. at 289.) Even accepting that these discussions occurred, the opinions of co-employees who have no part in the decision-making process do not give rise to an inference

of discrimination.[14]  Wheeler v. Aventis Pharm., 360 F.3d 853, 859 (8th Cir. 2004)

(comments not made by decision-maker are irrelevant).  Therefore, Maynard has not

presented sufficient evidence to raise a genuine issue of material fact with respect to

whether her being "micro managed" was a pretext for discrimination.

> **c.      Maynard's allegations of misconduct by other GMs who were not
> terminated**

Maynard asserts that male GMs engaged in various forms of misconduct and were not

disciplined.  She argues that this shows that MMC's proffered reasons are pretext for gender

discrimination.  (Mem. in Opp'n at 38.)  As with Maynard's allegations that male GMs were

given more control of their dealerships, Maynard's evidence concerning the misconduct of

other GMs consists of only her own assertions, many derived from hearsay.  Furthermore,

MMC does not assert that Maynard's termination was the result of misconduct, thus MMC's

failure to discipline other GMs for misconduct is irrelevant to Maynard's termination.

Accordingly, the Court finds that Maynard has not presented sufficient evidence to show a

material issue of fact exists regarding pretext due to misconduct by male GMs.

> **d.      Incidents showing a lack of respect for women**

Maynard alleges various conduct on the part of MMC and LAG personnel that she

claims indicates discriminatory animus toward women, and argues that this is evidence that

---

[14] In addition, Maynard has failed to find anyone else who will confirm her testimony in a deposition or affidavit.  Mays v. Rhodes, 255 F.3d 644, 648 (8th Cir. 2001) (unsworn accounts not considered for summary judgment).

MMC's proffered reasons for her termination are pretext.  (Mem. in Opp'n at 38.)  Most of the incidents cited by Maynard involve male co-employees (generally other GMs) who were not involved in the decision to terminate her, and are thus irrelevant.  <u>Wheeler</u>, 360 F.3d at 859.

Maynard also points to the fact that Luther did not shake her hand at a GM's meeting as support for her position.  (Mem. in Opp'n at 38.)  This account of one meeting is considered alongside evidence of at least one meeting after this incident between Luther and Maynard which Maynard later described as "positive," "very encouraging and a source of strength," and as "mentoring" that gave her a "much needed lift."  (Sarantopoulus Aff. Ex C-1.)  This evidence, considered with the fact that Luther hired Maynard as GM fully aware that she is a woman, would not permit a reasonable fact-finder to determine that Luther's failure to shake Maynard's hand at a meeting is sufficient evidence of pretext.  <u>Clark v. Johanns</u>, —— F.3d ——, 2006 WL 2466168, at *4 (8th Cir. Aug. 28, 2006) ("that [the plaintiff's supervisor] was the individual who initially hired [the plaintiff] as a woman also suggests that he was not motivated to discriminate against women when he later recommended that her appointment not be renewed"); <u>Kriss v. Sprint Communications Co., Ltd P'ship</u>, 58 F.3d 1276, 1282 (8th Cir. 1995) (that employer hired women, including plaintiff, is evidence "at odds with [the employer's] purportedly sexist nature").

### 3.     Gender Discrimination Conclusion

Because Maynard has not raised any genuine issues of material fact to show that MMC's proffered legitimate non-discriminatory reasons for her termination were

pretextual, MMC is entitled to summary judgment on Maynard's gender discrimination claims, and those claims will be dismissed.

**B.     Retaliation**

Maynard also asserts that she was unlawfully terminated in retaliation for refusing to rehire Medvec and complaining about Hendricks, and that she was unlawfully not rehired in retaliation for complaining to Luther about the treatment of women in the company.  She brings her retaliation claims under Title VII and the MHRA.[15]

Because she has presented no direct evidence of retaliation, the <u>McDonnell Douglas</u> burden shifting analysis governs the order and allocation of proof for Maynard's retaliation claims.  <u>Logan v. Liberty Healthcare Corp.</u>, 416 F.3d 877, 880 (8th Cir. 2005).  To establish a prima facie case of retaliation, Maynard must show that (1) she participated in a protected activity, (2) MMC took adverse employment action against her, and (3) a causal connection exists between the two.  <u>Id.</u>; <u>Haas v. Kelly Servs., Inc.</u>, 409 F.3d 1030, 1036-37 (8th Cir. 2005).  If Maynard can show a prima facie case of retaliation, the burden shifts to MMC to proffer a legitimate, non-discriminatory reason for its action; the burden then shifts back to Maynard to show that MMC's reasons are pretextual.  <u>Turner</u>, 421 F.3d at 696.  The Court will address each allegation of retaliation in turn.

**1.     Maynard's Refusal to Rehire Medvec**

Maynard claims that she was unlawfully terminated in retaliation for her refusal to

---

[15]The same analysis applies to Maynard's Title VII retaliation claims and her MHRA retaliation claims.  <u>Kasper v. Federated Mut. Ins. Co.</u>, 425 F.3d 496, 502 (8th Cir. 2005).

rehire Medvec, who she terminated for making a racist comment about her family members. (Mem. in Opp'n at 19.)  The Court assumes for the purposes of this Motion that Maynard's refusal to rehire Medvec as a result of his discriminatory actions is a protected activity. Because there is no dispute that Maynard suffered an adverse employment action, her ability to establish a prima facie case turns on the issue of causation.

Maynard argues that she has established that her refusal to rehire Medvec and her termination are causally connected because (a) a two-month interval exists between Luther's last request that Medvec be rehired and her termination, and (b) Luther became upset with her refusal to rehire Medvec.  (Mem. in Opp'n at 26-27.)

A mere coincidence of timing can rarely be sufficient to overcome summary judgment on a claim of retaliatory discharge.  See Kipp v. Mo. Highway Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (interval of two months between complaint and termination is too diluted to create the necessary temporal proximity for a causal connection in a retaliation claim); Gagnon v. Sprint Corp., 284 F.3d 839, 851-52 (8th Cir. 2002) (a one-month lapse between an EEOC claim and adverse employment action is not enough to establish causation).  Even accepting Maynard's assertion that the relevant interval between incidents is two months[16], this temporal connection—without more—is too

---

[16] Maynard fired Medvec in March 2003, roughly 22 months before her termination, and was first asked to rehire him in October 2003, roughly 14 months before her termination.  (Clay Aff. Ex. 15; Maynard Dep. Tr. at 35-36.)  The two-month interval suggested by Maynard only considered the last occasion in which Luther or Gallagher allegedly asked Maynard to rehire Medvec.  (Mem. in Opp'n at 26-27.)

attenuated to show causation.  The temporal connection is further attenuated by events such

as Maynard terminating two Used Car Managers after she terminated Medvec and the various

financial and personnel difficulties suffered by BVW through the end of 2003 and 2004.

Cheshewalla v. Rand & Son Constr. Co., 415 F.3d 847, 852 (8th Cir 2005) (intervening

events such as an unexcused absence or seasonal downturn in business "eroded" causation).

More specifically, the December financial report that Maynard described as "bloody," and

another year-end in which BVW showed no substantial progress toward returning to its

previous level of financial performance, occurred between the last mention of Medvec and

Maynard's termination.  (Sarantopoulos Aff. Exs. C-2, C-3.)

Maynard also argues that a causal connection is established because, in October

2003, Luther expressed to her that he was upset with her decision to fire Medvec.  (Maynard

Dep. Tr. at 35-36.)  However, under Maynard's theory, Luther then waited twelve months

hoping she would back down from her adamant refusal to rehire him, and another two

months after the subject was last broached, to terminate her.  Further, after Maynard was

terminated, Medvec was not rehired by any other LAG dealerships.  (Medvec Dep. Tr. at 51.)

The Court determines that Maynard's tenuous reasoning is not sufficient to allow her claim

to survive summary judgment.[17]

## 2.     Maynard's Complaints Against Hendricks

---

[17] Even if Maynard could establish a causal connection sufficient to meet her prima facie burden, her retaliation claim would still fail. She cannot show that MMC's reasons for her termination are a pretext for retaliation based on the same analysis that applied to her gender discrimination claim.

Maynard also claims that she was terminated in retaliation for complaining to MMC about Hendricks's treatment of her.  (Mem. in Opp'n at 19.)  The Court will assume that her complaint about Hendricks was a protected activity,[18] and she suffered an adverse employment action when she was terminated.  Thus, again, her claim turns on the issue of causation.

Much like Maynard's previous claim of retaliation, she relies on a combination of at least a two-month interval between her complaint and her termination,[19] and her allegation that Leslie advised her not to include a reference to gender discrimination or harassment in her complaint, as evidence of causation.  In short, Maynard's claim of retaliation with respect to Hendricks suffers from the same weaknesses as her claim as to the Medvec incident: inadequate temporal proximity, and little or no additional evidence of retaliatory animus.  (See supra pp.23-26.)  In fact, this claim is further weakened by evidence that, after

---

[18]There is some question as to whether Maynard's complaint about Hendricks constitutes a protected activity.  Maynard believes that Hendricks's behavior towards her was the result of her gender, and she only needs to show that she reasonably believed she was opposing an unlawful act or policy of the employer.  Sherman v. Runyon, 235 F.3d 406, 409-10 (8th Cir. 2000).  However, there is no evidence that Maynard ever communicated to any decision-maker in her termination that she believed Hendricks was harassing her because of her gender.  In Hunt v. Neb. Pub. Power Dist., the plaintiff was found not to have engaged in a protected activity because, while she complained she was entitled to a pay raise or promotion, the plaintiff did not attribute the company's failure to do so to gender discrimination.  282 F.3d 1021, 1028 (8th Cir. 2002).  Despite this reservation, the Court will assume, without deciding, that Maynard's complaints about Hendricks constitute a protected activity for the purposes of this Motion.

[19] Maynard first complained of Hendricks's conduct on September 14, 2004, over four months before her termination; and last discussed the situation with Luther and Gallagher in November 2004, roughly two months before her termination.  (Clay Aff. Ex. 16, 22.)

Maynard's complaint, Gallagher—a decision-maker in Maynard's termination—talked to Hendricks to keep him from "meddling" in BVW's affairs.  (Luther Dep. Tr. at 102; Clay Aff. Ex. 18.)  Accordingly, the Court determines that Maynard has failed to raise a genuine issue of material fact with respect to the claim of retaliation for her complaint about Hendricks.[20]

### 3.    Maynard Not Rehired After Complaining About the Treatment of Women

Maynard claims that she was not rehired at Hopkins Honda in retaliation for a statement she made to Luther about the treatment of women at MMC.  (Mem. in Opp'n at 19.)  A fact-finder could determine that Maynard made a complaint to Luther about the disparate treatment of women and that this complaint amounted to a protected activity.  See Peterson, 406 F.3d at 524-25.  Further, not being rehired constitutes an adverse employment action.  Thus, Maynard can establish a prima facie case of retaliation if a fact-finder could find a causal connection between the protected activity and the adverse employment action.  Haas, 409 F.3d at 1036-37.

The Court determines that a reasonable fact-finder could find that Allison knew about the protected activity at the time he made the decision not to rehire Maynard, or that, even if Allison did not know of the protected activity, Luther influenced, or exercised control over,

---

[20] Even if Maynard could establish a causal connection sufficient to meet her prima facie burden, her retaliation claim would still fail. She cannot show that MMC's reasons for her termination are a pretext for retaliation based on the same analysis that applied to her gender discrimination claim.

the decision shortly after Maynard's complaint to him about the manner in which women were treated at MMC.  Moreover, Maynard complained to Luther less than a week prior to her being informed she would not be rehired.  Such temporal proximity between the protected activity and the adverse employment action may create an inference of causation in some circumstances.  E.E.O.C. v. Kohler Co., 335 F.3d 766, 773-74 (8th Cir. 2003).  Accordingly, an issue of material fact exists with respect to causation.

Further, the Court determines that Maynard has raised a genuine issue of material fact concerning whether MMC's proffered legitimate, non-retaliatory reason for not rehiring her is pretextual.  MMC proffers that Allison came to the decision to not rehire Maynard as a result of his discussions with his senior managers.  (Mem. in Supp. at 25-26.)  A jury might reasonably conclude that Allison would not withdraw the offer to Maynard without the approval of Luther, who Allison believes initiated the rehiring process.  (Allison Dep. Tr. at 31, 35, 38.)  A reasonable fact-finder could determine that Allison's account of his decision-making process concerning the rehiring of Maynard is "unworthy of credence" or that Maynard's protected statement to Luther was a motivating factor in the decision to not rehire her.  Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1021 (8th Cir. 2005); Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833-34 (8th Cir. 2002).  Accordingly, the Court will deny MMC's Motion for Summary Judgment on the issue of whether Maynard was not rehired at Hopkins Honda in retaliation for engaging in protected activity.

## Conclusion

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 21) is:

I.      **GRANTED** with respect to Counts I, II, III, IV, and V of the Complaint (Doc.

No. 1), and those claims are **DISMISSED WITH PREJUDICE**; and

II.      **DENIED** with respect to Counts VI and VII of the Complaint, and those

claims remain for trial.


Dated: August 31, 2006                                    s/Richard H. Kyle
                                                         RICHARD H. KYLE
                                                         United States District Judge